1   NORMAN J. BLEARS (Bar No. 95600)
    MICHAEL L. CHARLSON (Bar No. 122125)
2   HOGAN LOVELLS US LLP
    525 University Avenue, 4th Floor
3   Palo Alto, California  94301
    Telephone:  + 1 (650) 463-4000
4   Facsimile:  + 1 (650) 463-4199
    norman.blears@hoganlovells.com
5   michael.charlson@hoganlovells.com

6   BENJAMIN T. DIGGS (Bar No. 245904)
    HOGAN LOVELLS US LLP
7   Four Embarcadero Center, 22nd Floor
    San Francisco, California  94111
8   Telephone:  + 1 (415) 374-2300
    Facsimile:  + 1 (415) 374-2499
9   benjamin.diggs@hoganlovells.com

10  Attorneys for Defendants
    VIVUS, INC., LELAND F. WILSON
11  and WESLEY W. DAY, Ph.D.

12              UNITED STATES DISTRICT COURT

13           NORTHERN DISTRICT OF CALIFORNIA

14                  OAKLAND DIVISION

15

16  MERLE KOVTUN, Individually and on        Case No.  4:10-CV-04957-PJH
    Behalf of Others Similarly Situated,
17                                           **REPLY MEMORANDUM IN FURTHER
                 Plaintiff,                  SUPPORT OF DEFENDANTS' MOTION
18                                           TO DISMISS SECOND AMENDED CLASS
         v.                                  ACTION COMPLAINT**
19
    VIVUS, INC., LELAND F. WILSON, and       Date:      April 18, 2012
20  WESLEY W. DAY, Ph.D.,                     Time:      9:00 a.m.
                                             Courtroom: 3 – 3rd Floor
21               Defendants.
                                             The Honorable Phyllis J. Hamilton
22

23

24

25

26

27

28

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW
PALO ALTO

REPLY MEM. ISO MOTION TO DISMISS SECOND
AMENDED CLASS ACTION COMPLAINT;
Case No. 4:10-cv-04957-PJH

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................ 1

II.  ADDITIONAL FACTUAL BACKGROUND .................................................... 2

III. ARGUMENT ..................................................................................................... 3

    A.   The New Complaint Does Not Comply with the Court's
        October 2011 Order................................................................................. 3

    B.   The Advisory Committee's Lopsided February 22, 2012
        Vote Recommending Approval Shows the Fallacy of Plaintiff's Claims ............. 5

    C.   Plaintiff Fails to Allege Facts Showing That Defendants'
        Statements About Safety Data from the Qnexa Trials Were Materially
        False or Misleading ................................................................................. 6

        1.   The market reaction supports Defendants' statements............................... 6

        2.   The Committee's discussion shows a close vote, not fraud....................... 8

        3.   Plaintiff ignores the context of Defendants' statements and
            mischaracterizes the *Matrixx* decision. ....................................... 9

        4.   Defendants' statements about trial results related to specific
            potential side effects were truthful........................................... 12

        5.   Defendants' risk disclosures belie Plaintiff's claims of
            deception ........................................................................... 16

        6.   Statements of general optimism and opinion are not
            actionable ......................................................................... 17

    D.   Plaintiff Fails to Allege A Strong Inference of Scienter ...................... 17

IV.  CONCLUSION ................................................................................................ 20

Hogan Lovells US
LLP
Attorneys At Law
Palo Alto

i

REPLY MEM. ISO MOTION TO DISMISS SECOND
AMENDED CLASS ACTION COMPLAINT;
Case No. 4:10-cv-04957-PJH

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

CASES

4     *Applestein v. Medivation, Inc.*,

5        2012 WL 986276 (N.D. Cal. Mar. 22, 2012) .......................................................................... 19

6     *Construction Laborers Pension Trust of Greater St. Louis v. Neurocrine Biosciences, Inc.*,
       2008 WL 2053733 (S.D. Cal. May 13, 2008) ........................................................................ 15

7

8     *DeMarco v. DepoTech Corp.*,
       149 F. Supp. 2d 1212 (S.D. Cal. 2001) ................................................................................. 9

9     *Gibson v. United States*,

10        781 F.2d 1334 (9th Cir. 1986) .............................................................................................. 4

11     *Glen Holly Entm't Inc. v. Tektronix, Inc.*,
       352 F.3d 367 (9th Cir. 2003) ................................................................................................ 17

12

13     *Glenfed, Inc. Sec. Litig.*,
       42 F.3d 1541 (9th Cir. 1994) ................................................................................................ 4

14     *Heywood v. Cell Therapeutics, Inc.*,

15        2006 WL 5701625 (W.D. Wash. May 4, 2006) .................................................................. 10

16     *In re Amylin Therapeutics, Inc. Sec. Litig.*,
       2003 WL 21500525 (S.D. Cal. May 1, 2003) .............................................................. 10, 17

17

18     *In re AstraZeneca Sec. Litig.*,
       559 F. Supp. 2d 453 (S.D.N.Y. 2008) ........................................................................ 8, 9, 18

19     *In re Avon Prods., Inc. Sec. Litig.*,

20        2009 WL 848017 (S.D.N.Y. Feb. 23, 2009) ....................................................................... 17

21     *In re Bare Escentuals, Inc. Sec. Litig.*,
       745 F. Supp. 2d 1052 (N.D. Cal. 2010) ......................................................................... 7, 16

22

23     *In re Discovery Labs. Sec. Litig.*,
       2006 WL 3227767 (E.D. Pa. Nov. 1, 2006) ....................................................................... 17

24     *In re Gilead Sciences Sec. Litig.*,

25        536 F.3d 1049 (9th Cir. 2008) .............................................................................................. 7

26     *In re Immune Response Sec. Litig.*,
       375 F. Supp. 2d 983 (S.D. Cal. 2005) ................................................................................. 10

27     *In re Merck & Co., Inc. Sec., Deriv. & ERISA Litig.*,

28        2011 WL 3444199 (D.N.J. Aug. 8, 2011) ........................................................................... 10

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
PALO ALTO

ii

REPLY MEM. ISO MOTION TO DISMISS SECOND
AMENDED CLASS ACTION COMPLAINT;
Case No. 4:10-cv-04957-PJH

*In re Nuvelo Inc. Sec. Litig.*,
   668 F. Supp. 2d 1217 (N.D. Cal. 2009) ................................................................ 10

*Marolda v. Symantec Corp.*,
   672 F. Supp. 2d 992 (N.D. Cal. 2009) ................................................................... 4

*Matrixx Initiatives, Inc. v. Siracusano*,
   131 S. Ct. 1309 (2011) ......................................................................... 9, 11 14, 17

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003).................................................................................. 7

*Padnes v. Scios Nova, Inc.*,
   1996 WL 539711 (N.D. Cal. Sept. 18, 1996) ........................................................ 9

*Philco Invs. v. Martin*,
   2011 WL 500694 (N.D. Cal. Feb. 9, 2011)..................................................... 11, 17

*Philco Invs. v. Martin*,
   2011 WL 4595247 N.D. Cal. Oct. 4, 2011) .......................................................... 11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)............................................................................................ 18

*Virginia Bankshares v. Sandberg*,
   501 U.S. 1083 (1991).......................................................................................... 17

*Warshaw v. Xoma Comp.*,
   74 F.3d 955 (9th Cir. 1996)................................................................................. 10

*Yourish v. California Amplifier*,
   191 F.3d 983 (9th Cir. 1999)............................................................................... 16

**STATUTES**

15 U.S.C. § 78u-5(c) ...................................................................................... 16, 17

**OTHER AUTHORITIES**

Rule 9(b)......................................................................................................... 4, 17

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
PALO ALTO

iii

REPLY MEM. ISO MOTION TO DISMISS SECOND
AMENDED CLASS ACTION COMPLAINT;
Case No. 4:10-cv-04957-PJH

# I.    **INTRODUCTION**

As with his response to Defendants' initial motion to dismiss, Plaintiff opposes this motion largely by ignoring its points.  Like his Second Amended Complaint (the "New Complaint"), the Opposition repeats general assertions about purported omissions based on after-the-fact summaries and fragments from the FDA Advisory Committee's July 15, 2010 hearing. He misses entirely that he needs *facts*, existing at the time of Defendants' supposed misstatements, that support a strong inference that Defendants' class-period statements were false or misleading when made, and that Defendants were at least deliberately reckless in not so recognizing.  It is not enough to repeat most every question raised by a Committee member as if it reflected an established, serious side effect of Qnexa that was undisclosed but known to Defendants all along – particularly when the Committee record makes clear that many issues that Plaintiff posits as major safety concerns were not so viewed, and in some cases were not observed in the trials at all.

To plead securities fraud, Plaintiff must address, with specific factual allegations, two critical points.  First, he must show that there was some clinically significant side effect apparent from the trial data that Defendants knew about when they spoke, but did not disclose.  Despite access to the entire Advisory Committee record for 18 months now, Plaintiff points to none because there were none.  Second, Plaintiff needs to plead specific facts that make it more plausible than alternative explanations that the side effects observed in the clinical trials, viewed in the context both of the known safety profiles of Qnexa's components and of the drug's efficacy data, were of a nature that Defendants, at the time they were making positive statements about Qnexa, in fact believed that those safety issues rendered the drug either not approvable or not saleable.  Despite its substantial added heft, the New Complaint offers no new substance on these points.  Nor does Plaintiff's Opposition offer any fresh perspective to explain his pleading deficiencies.  Consequently, Defendants refer to, and renew, their arguments from both their opening papers and prior briefing, all of which apply equally here, as grounds for dismissal.

This time around, however, there is more.  Were there any doubt about the inadequacy of Plaintiff's claims, it was put to rest on February 22, 2012, when the Advisory Committee met again to consider Qnexa, this time on a record that included a second year of trial data.  After the

Hogan Lovells US
LLP
ATTORNEYS AT LAW
PALO ALTO

1

REPLY MEM. ISO MOTION TO DISMISS SECOND
AMENDED CLASS ACTION COMPLAINT;
Case No. 4:10-cv-04957-PJH

1   FDA stated in its briefing memorandum that the second year's data "was consistent with the

2   safety profile" that VIVUS reported in its original New Drug Application ("NDA"), the Advisory

3   Committee voted 20-2 to *recommend Qnexa for approval*.  The issue now awaits FDA

4   consideration.  In contrast with Plaintiff's failure to offer facts showing their story of alleged

5   fraud to be the "more plausible" explanation for the stock price decline, the February 2012

6   Committee vote vindicates Defendants' stated optimism about Qnexa and its prospects, and their

7   commitment of tens of millions of dollars to the Qnexa clinical trials in the effort to gain approval

8   for the drug.  The 2012 action confirms the prior Committee vote to have been precisely what the

9   record of the July 15, 2010 deliberations – read as a whole, rather than in snippets – shows:  a

10  cautious Advisory Committee, though seeing nothing alarming in the one-year data, wanted to

11  confirm the drug's safety over a longer period given that many patients would likely remain on

12  the drug for an extended time.

13          What happened on July 15, 2010 was the adverse resolution of a disclosed risk inherent in

14  an investment in drug-development company like VIVUS.  In his New Complaint, Plaintiff offers

15  many more words.  But in the end, he fails to allege anything beyond a negative vote by the

16  Advisory Committee to support his conclusory assertion that the detailed Qnexa clinical trial data

17  somehow contradicted Defendants' statements made during the alleged class period, much less

18  that Defendants knew, or were deliberately reckless in not knowing, that the negative vote was, as

19  Plaintiff terms it, "inevitable."  The New Complaint comes nowhere close to meeting the

20  stringent requirements for pleading securities fraud.  It should be dismissed, with prejudice.

21  **II.       ADDITIONAL FACTUAL BACKGROUND**

22          In its Complete Response Letter ("CRL") to VIVUS on October 28, 2010, the FDA asked

23  VIVUS to submit the results of its year-long continuation trial of Qnexa ("SEQUEL") and to

24  address two specific areas of interest:  teratogenicity and cardiovascular risk.  ¶ 239.[1]  As

25  described in the New Complaint, VIVUS re-submitted its NDA for FDA approval in the fall of

26  2011.  *Id.* ¶ 241.  On February 17, 2012, the FDA released its briefing document analyzing

---

[1]  Despite Plaintiff's reference to it in the New Complaint, VIVUS has not included the CRL, a confidential document, in the record on this motion.  If the Court considers it significant, VIVUS would be pleased to provide it with entry of an order permitting its submission under seal.

Hogan Lovells US LLP
Attorneys At Law
Palo Alto

2

REPLY MEM. ISO MOTION TO DISMISS SECOND
AMENDED CLASS ACTION COMPLAINT;
Case No. 4:10-cv-04957-PJH

1  VIVUS's new submission, including the two-year data from the SEQUEL trial.  *See* Reply Ex. 1.[2]

2  Summarizing the safety data, the FDA stated that "[i]n general, safety data from the 52-week

3  extension study, OB-305, was consistent with the safety profile noted in the 1-year safety cohort."

4  *Id.* at 3; *see also id.* at 76 (same).  On February 22, 2012, another Advisory Committee (the "2012

5  Committee"), including many of the same members as in July 2010, but as well as additional

6  experts, met to consider Qnexa again.  Reply Ex. 2.  Recognizing that the strong safety data

7  presented after one year remained consistent through a second year of use, the 2012 Committee

8  voted overwhelmingly, 20-2, to recommend approval.  Reply Exs. 3, 4.[3]

9  **III.    ARGUMENT**

10      **A.    The New Complaint Does Not Comply with the Court's October 2011 Order**

11          Plaintiff stands behind his technique of first quoting Defendants' public statements in full,

12  and then pasting after nearly every sentence a selection from a stable of repeated "reasons" those

13  statements are misleading or false.  Plaintiff says he has met his obligation because the New

14  Complaint purportedly describes why each statement was false and misleading "with exhaustive

15  particularity" and contains "a mountain of detailed factual information."  Opp. at 6.  While the

16  New Complaint is indeed mountainous and exhausting, it satisfies neither the Court's October 13,

17  2011 Order nor the exacting pleading standards applicable to Plaintiff's case.

18          Plaintiff mistakes mind-numbing repetition for factual particularity, in his New Complaint

19  even more than in his prior effort.  Breaking out each Defendant disclosure sentence by sentence

20  and adding dozens of pages to the New Complaint means nothing when the "reasons" for falsity

21  that comprise Plaintiff's mantra are either (1) not facts, but are instead later-expressed opinions or

22  concerns of Committee members (*see, e.g.* ¶¶ 57(b)(i), (iii) (vi), (ix)); or (2) facts that were either

23  disclosed by Defendants early in the class period and/or constitute additional detail consistent

24

25  [2] *See* Supplemental Request for Judicial Notice in Support of Motion to Dismiss Second
    Amended Complaint ("Reply RJN") and accompanying exhibits.  Numbered exhibits to the Reply
26  RJN are referred to as "Reply Ex._," while "Ex._" refers to lettered exhibits to the Diggs
    Declaration filed with Defendants' opening brief, the ("Mot.").  All references to "¶" are to the
    New Complaint unless otherwise indicated.

27  [3] The 2012 Committee included 12 members who had participated in the July 2010 Advisory
28  Committee, including 7 who previously voted against approval.  Six of those 7 voted for approval
    at the February 2012 Committee meeting.

Hogan Lovells US
LLP
Attorneys At Law
Palo Alto

3

REPLY MEM. ISO MOTION TO DISMISS SECOND
AMENDED CLASS ACTION COMPLAINT;
Case No. 4:10-cv-04957-PJH

1   with Defendants' disclosures (*see, e.g.* ¶¶ 57(b)(iii), (iv), (vii), (viii)).[4]  Plaintiff has not complied

2   with the Court's October 13 Order to provide a clear and comprehensible account of which

3   Defendant statements are false and misleading and what specific facts support that grave assertion.

4        Plaintiff primarily relies on incomplete summaries of *opinions* of Advisory Committee

5   members and attempts to pass them off as *facts*. But even if the opinions were facts, Plaintiff fails

6   to explain how they demonstrate that Defendants' many quoted statements were false or

7   misleading when made.  Plaintiff still leaves it to Defendants and the Court to provide the logical

8   and factual linkage between the quoted statements and his grab-bag of "reasons" – a matching

9   exercise that Plaintiffs' swollen New Complaint has complicated further.  As the Ninth Circuit

10  explained even before the Private Securities Litigation Reform Act, a complaint does not plead

11  fraud with specificity where it alleges merely that "defendant said A whereas the true fact is B."

12  Unless a plaintiff *explains why* A and B are supposed to be inconsistent with one another, he has

13  not adequately pled fraud.  *Glenfed, Inc. Sec. Litig.,* 42 F.3d 1541, 1553 n.11 (9th Cir. 1994).

14  Plaintiff must allege with specificity *why* and *how* the alleged misstatements are false.  *Marolda*

15  *v. Symantec Corp.*, 672 F. Supp. 2d 992, 1000-01 (N.D. Cal. 2009).  He comes nowhere close.

16       Eschewing his burden under Rule 9(b) and the PSLRA, Plaintiff says he need not plead

17  "evidence" or "specific factual details not ascertainable in advance of discovery."  Opp. at 6,

18  quoting *Gibson v. United States*, 781 F.2d 1334, 1340 (9th Cir. 1986).  That pre-PSLRA, pre-

19  *Iqbal* and *Twombly*, *civil rights* case does not mention Rule 9(b) and has no relevance to the

20  insufficiency of Plaintiff's pleading here.  Specific facts are *exactly* what the securities fraud

21  pleading standards require; and the public record from which those facts might be drawn, if they

22  existed, is extensive in this case.[5]  That Plaintiff cannot provide that factual information, but

---

[4]  As Defendants have discussed before, the conclusion that the facts disclosed in the complete FDA briefing were consistent with, not contradictory to, Defendants' prior statements is evident not only from a plain comparison, but also from the substantial positive reaction to public release of the detailed data, including a 17% increase in VIVUS's stock price on June 13, 2010.  Had there been some "bombshell" in the data that contradicted earlier optimistic statements, the markets would have reacted in precisely the opposite way.  *See infra* at Part III.C.1.

[5]  What factual information Plaintiff claims to provide underscores, rather than refutes, the New Complaint's deficiencies.  Plaintiff says the "mountain of detailed factual information" includes "the substance of the Summary Minutes, Vivus's decision to conduct another fetal outcome study, and the problems with combining phentermine and topiramate."  But he fails to allege how a brief

REPLY MEM. ISO MOTION TO DISMISS SECOND
AMENDED CLASS ACTION COMPLAINT;
Case No. 4:10-cv-04957-PJH

instead disclaims the need to do so, speaks volumes.

      **B.**    **The Advisory Committee's Lopsided February 22, 2012 Vote Recommending Approval Shows the Fallacy of Plaintiff's Claims**

As noted, the FDA Advisory Committee reconsidered Qnexa on February 22, 2012, and voted overwhelmingly to recommend approval. Through two motions to dismiss, Defendants have contended that many members of the July 15, 2010 Advisory Committee who voted against approval did so *not* because of issues with the data gathered to that point, but out of a desire to *confirm* that those data held up over time. *See, e.g.* Mot. at 9. Plaintiff responds that Defendants "knew or should have known that the [approval] effort was doomed to failure based on the outcome of the clinical studies." Opp. at 25 n.24. That dispute has now been decisively resolved. The two-year data demonstrated a safety profile consistent with data gathered over one year (*see* Reply Ex. 1 at 3, 76) and confirmed the safety profile of Qnexa that Defendants reported on the first day of the alleged class period. Ex. B. The recent lopsided vote for approval shows that many Committee members who first voted against approval needed precisely what they said in July 2010 – to see the safety profile reflected in the Phase 3 trial data to that point sustained over a longer period. *E.g.*, Ex. G at 354 ("I think we need more data"), 361 ("we just need longer term data"). That fact sinks Plaintiff's argument that Qnexa's demonstrated side effects "doomed" any prospect of a favorable Committee vote, and that Defendants knew that when they made positive statements about Qnexa's safety. Without that argument, Plaintiff's entire fraud claim dissolves.

Plaintiff will no doubt say that the 2012 vote, coming after the alleged class period, is irrelevant.[6] But Plaintiff's theory of fraud is that Qnexa's safety data, which Defendants knew about but purportedly did not disclose, was so bad that Defendants knew Qnexa "could not and would not be approved." Opp. at 4; ¶¶ 54-203. Over and over Plaintiff alleges that "the Phase 3

---

summary of some opinions expressed in 372 pages of transcript at the Advisory Committee or an October 2011 announcement of a follow-up study shows the much earlier statements by to have been false when made. Nor does he plead facts – beyond his own say-so – suggesting new issues specific to combining Qnexa's two component drugs. *See* Mot. at 15-16; *infra* at Part III.C.3. Despite the Court's clear directive, Plaintiff still leaves it to Defendants and the Court to guess 1) *what* facts support Plaintiff's allegations and (2) *how* those supposed facts might support his claims of fraud.

[6] Of course, Plaintiff has no trouble relying on post-class period developments where he thinks they *help* his case. *See, e.g.* ¶¶ 238-41 (detailing post-class period analyst reports, the FDA's October 2010 denial of VIVUS's NDA, and VIVUS's 2011 resubmission of that NDA).

Hogan Lovells US
LLP
Attorneys At Law
Palo Alto

5

REPLY MEM. ISO MOTION TO DISMISS SECOND
AMENDED CLASS ACTION COMPLAINT;
Case No. 4:10-cv-04957-PJH

1    Trials showed significant, potentially serious and life-threatening adverse effects of the type that

2    scuttled approval for other obesity drugs" and that "fact" made every Defendant statement false.

3    Defendants have noted that what Plaintiff characterizes as problems that the clinical data

4    "showed" were in fact cited by Committee members as *potential* issues.  *See, e.g.*, Mot. at 13 n.6;

5    Ex. G at 151, 304, 320, 350, 367; *see also id.* at 53 (only death in the Phase 3 trials was a patient

6    in one study's placebo arm).  The 2012 Committee vote confirms Defendants' position and

7    resolves those "potential" issues in favor of approval in nearly every member's mind.  The 2012

8    Committee vote is relevant because it points up the problem with Plaintiff's reliance on out-of-

9    context, incomplete citation to Committee members' opinions and expressions of concern, rather

10   than facts.  The facts – that is, the Qnexa safety profile demonstrated by Phase 3 data – have not

11   changed; but with confirmation of those data over a longer time, the Committee's conclusions

12   have, and the vote outcome is very different.  Plaintiff's house of cards has collapsed.[7]

### C. Plaintiff Fails to Allege Facts Showing That Defendants' Statements About Safety Data from the Qnexa Trials Were Materially False or Misleading

#### 1. The market reaction supports Defendants' statements.

Plaintiff cannot dispute that both the VIVUS and FDA briefing documents analyzing the

Qnexa trial data were publicly released on July 13, 2010.  His claim that previously undisclosed

negative data contradicted Defendants' prior positive statements is undermined by the fact that

when the detailed Qnexa data and analysis were disclosed, two days before the Committee

meeting, VIVUS's stock price jumped dramatically.  The market, awaiting these materials,

understood that the data confirmed what the Company had previously said; and investors voted

their dollars accordingly.  As we have explained before, this fact is a death knell to Plaintiff's

claims; not surprisingly, his attempt to square it with his own imagined story of fraud conflicts

with both his own allegations and the judicially noticeable record.

---

[7] Plaintiff may argue that Defendants knew Qnexa's demonstrated safety data meant Qnexa would not be recommended for approval after *one year*, but might be after two years, and therein lies the fraud.  Beyond that Plaintiff alleges no facts to support that parsing interpretation, the conclusion conflicts with the fact the Phase 3 trial design and endpoints were cleared with the FDA under a Special Protocol Assessment ("SPA") and the fact that the FDA's Guidance for Industry states "a reasonable estimation of the safety of a weight-management product upon which to base approval generally can be made … [after] 1 year of treatment."  Ex. D. at 246.

1    Plaintiff again hypothesizes that "investors needed the expert guidance and comments

2    from the FDA Panel to fully digest and comprehend the true meaning of the voluminous safety

3    data." Opp. at 18.  This directly contravenes Plaintiff's efficient-market allegations, (¶¶ 34-35) –

4    allegations necessary to support Plaintiff's invocation of a "fraud-on-the-market" theory of

5    reliance.  *See In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1074 (N.D. Cal. 2010).

6    Plaintiff cannot have it both ways, at once alleging that "the market for Vivus securities *rapidly*

7    *absorbed all publicly material information* regarding Vivus and that information was reflected in

8    the price of Vivus securities" (¶ 35), but then claiming that "the market took two days to process

9    the significance of these analyses and the underlying data" (Opp. at 18).  Plaintiff notes that the

10   briefing documents with exhibits ran 555 pages.  Opp. at 18.  But all of the key safety

11   "revelations" upon which his fraud theory appears to rely – the "double rate of depression," the

12   "four times as many cognitive adverse effects," the "increased heart rate" and so forth – are

13   summarized within the *first seven pages* of the FDA Memo.  *See* Ex. J at 3-7.  In any event, the

14   fallacy of Plaintiff's version of market-efficiency theory is underscored by the fact that VIVUS's

15   stock *was* responsive: on July 13 when the data came out, the stock posted its largest one-day

16   gain since September 2009.[8]  The July 13 FDA release and price reaction contradict Plaintiff's

17   assertion that "[t]he deception finally unraveled on July 15, 2010" (Opp. at 4); the only thing that

18   happened on July 15 was the Advisory Committee vote.[9]  There can be no real dispute under

19   Plaintiff's own efficient-market allegations:  the market evaluated the information released on

20   July 13 and made its own positive determination.  That fact negates Plaintiff's assertion that

21

22   [8]  Plaintiff's reliance on the *No. 84 Employer-Teamster* and *Gilead* cases is misplaced.  Opp. at 18.
      In those cases, the share-price decline was delayed either by revelation of previously undisclosed

23   information or by a continuing misrepresentation.  *See In re Gilead Sciences Sec. Litig.*, 536 F.3d
      1049, 1054 (9th Cir. 2008) (impact of off-label marketing and FDA Warning Letter about it

24   revealed only later, when Gilead released its quarterly financial results showing disappointing
      sales of the subject drug); *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am.*

25   *West Holding Corp.*, 320 F.3d 920, 935 (9th Cir. 2003) (price response delayed because America
      West continued to reassure analysts that compliance with the subject settlement agreement would

26   have no noticeable economic effect on the company).  Nothing analogous is alleged here.

27   [9]  Plaintiff claims that by not arguing loss causation as a specific ground for dismissal on this
      motion, Defendants "conceded that the report of the vote of the FDA Panel…did, indeed, reveal

28   the truth of Defendants' prior misrepresentations and omissions to the market," causing loss to
      Class Members.  Opp. 18 at n.15.  Of course, Defendants concede nothing of the sort.

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
PALO ALTO

7

REPLY MEM. ISO MOTION TO DISMISS SECOND
AMENDED CLASS ACTION COMPLAINT;
Case No. 4:10-cv-04957-PJH

1    VIVUS's earlier optimistic statements about Qnexa's prospects were false or misleading.[10]

2                    2.    The Committee's discussion shows a close vote, not fraud.

3          Plaintiff says that Defendants made statements "which led investors to believe that FDA

4    approval of Qnexa was all but assured" while in possession of data that, when it became public,

5    meant "Qnexa could not and would not be approved by the FDA based on existing safety data".

6    Opp. at 4.  That all-or-nothing theory discounts not only the market's ability to interpret the data

7    as noted above, but also the expertise and judgment of the Committee members who voted to

8    recommend approval in July 2010.  Plaintiff's claim that the Committee's negative vote was

9    "inevitabl[e]" (id. at 2) cannot be squared with, for example, Dr. Hendricks's feeling that VIVUS

10   "did an outstanding job producing the data, and that the data does show … that the drug is

11   reasonably safe and that we should approve it."  Ex. G at 364.  How could Defendants' statements

12   to the same end be fraudulent?  Neither the New Complaint nor the Opposition explains this basic

13   inconsistency:  if the clinical data plainly contradicted Defendants' statements about Qnexa's

14   approval prospects, how could six Committee experts have recommended approval (and much of

15   the investing public concluded approval was likely)?  Cf. ¶ 238 (citing news article calling

16   Committee result a "surprise vote").  The answer, of course, is that those voting for approval did

17   not miss some land mine in the data; they merely judged the data and the balancing of risks

18   differently from those who wanted a longer look.  This rebuts a claim of fraud.

19         The AstraZeneca case involved similar claims – that AstraZeneca misrepresented the

20   safety and potential approvability of its trial drug, Exanta.  In re AstraZeneca Sec. Litig., 559 F.

21   Supp. 2d 453, 456 (S.D.N.Y. 2008).  There, plaintiffs alleged that when the FDA briefing was

---

[10]  Plaintiff's attempt to parse the language of two July 13, 2010 articles reporting on the release of the FDA analysis is as unavailing as his attempt to avoid the consequences of his efficient-market allegations.  See Opp. at 18.  First, his assertion that the market reacted only to the "tone" of the FDA Memo and not to any safety information is belied by the article Plaintiff quotes.  That article states, among other things, that "[t]he FDA review focuses mainly on the drug's safety, notably the potential for birth defects, psychiatric and cognitive side effects, …metabolic acidosis, and cardiovascular risks."  Ex. F at 1 (also noting other side effects and stating the "panel may be reluctant to recommend approval with the safety risks").  To suggest that investors received only data on efficacy and not safety is just wrong.  See also Exs. AA, BB.  Second, Plaintiff's efforts to explain away these particular articles miss the point.  The data and the FDA's analysis of it were public and, together with these and other media and analyst reports on all sides, were reflected in the market price for VIVUS stock, which rose 17%.

Hogan Lovells US
LLP
Attorneys At Law
Palo Alto

8

REPLY MEM. ISO MOTION TO DISMISS SECOND
AMENDED CLASS ACTION COMPLAINT;
Case No. 4:10-cv-04957-PJH

released days before the advisory committee meeting, AstraZeneca stock dropped 6%, and at least one analyst stated that the FDA briefing revealed new safety issues not previously disclosed. *Id.* at 462-63. Shortly thereafter, plaintiffs claimed, an advisory committee voted 11-1 against recommending approval, and AstraZeneca was lambasted in the media for concealing the extent of Exanta's safety issues. *Id.* at 463. Even so, after reviewing the FDA and company briefings to the advisory committee, the court found no knowingly false or misleading statements. "It is impossible to read the FDA document and the AstraZeneca document without concluding that both present the honest analysis and conclusions of their authors." *Id.* at 471. The vote against approval, even at 11-1, "does not mean that [the sponsor] was not conscientious in advocating the drug [] before the FDA, nor does it mean that the information issued publicly over the course of more than a year was dishonest or recklessly disseminated." *Id.*

The logic of *AstraZeneca* applies even more forcefully here, where: (1) VIVUS's stock price rose sharply upon release of the FDA briefing materials; (2) Plaintiff alleges no contemporaneous public or media reaction suggesting the briefing materials disclosed previously unknown risks; (3) the Committee voted 10-6, with the Committee chair stating that "the committee seems to be closer than perhaps appears…." (Ex. G. at 351); and more recently, (4) an expanded Advisory Committee reconvened and voted overwhelmingly to recommend approval once an additional year's data substantially confirmed the safety data initially presented. Nothing in the New Complaint transforms this debate between honestly held positions into a tale of fraud and deception. Mot. at 12-13; *see also Padnes v. Scios Nova, Inc.*, 1996 WL 539711, at *5 (N.D. Cal. Sept. 18, 1996); *DeMarco v. DepoTech Corp.*, 149 F. Supp. 2d 1212, 1225 (S.D. Cal. 2001).

3.   Plaintiff ignores the context of Defendants' statements and mischaracterizes the *Matrixx* decision.

Despite the close July 2010 vote by a divided panel, Plaintiff asserts that certain Committee members' desire to see longer-term safety data reflected a "consensus as to the inadequacy of Qnexa's safety data" from its year-long Phase 3 trials. Opp. at 14. Like his contention that the safety data made a negative Committee vote "inevitable," the record belies this assertion as well. Yes, some Committee members, like Dr. Proschan, said that "I think if we had

Hogan Lovells US
LLP
Attorneys At Law
Palo Alto

9

REPLY MEM. ISO MOTION TO DISMISS SECOND
AMENDED CLASS ACTION COMPLAINT;
Case No. 4:10-cv-04957-PJH

had longer follow-up, I probably would have voted [for approval].  But I just don't feel

comfortable with one year follow-up."  Mot. at 11; Ex. G at 351.  But lack of data about longer-

term safety does not equate to a *demonstrated* lack of long-term safety – as the additional year of

data that VIVUS submitted with its renewed NDA shows.  Plaintiff cites no findings to

undermine the truth of Defendants' statements about the results observed in the one-year trials, a

period selected based on the FDA's Guidance for Industry and approved in SPAs.  *See* Mot. at 12.

Nor were calls by some Committee members for longer-term data based on a stated view that

*observed* safety issues precluded approval.  Instead, they expressed concern about *potential* safety

issues (known to be issues with Qnexa's components) and a desire to ensure that those issues did

not present themselves as serious after prolonged use of the drug.  *Id*. at 10 n.3.  As discussed, the

2012 Committee vote reflects that that desire was satisfied by the two-year data.

        Plaintiff's efforts to equate this case with others actually involving material omissions of

negative trial data again underscore what is missing from the New Complaint.  In several cases

Plaintiff cites, courts found fraud adequately pled where defendants continued to assure the public

of strong trial results when underlying data allegedly known to them revealed no observable

difference between outcomes on the drug and placebo arms, and no basis for believing the drugs

were at all effective.  *In re Immune Response Sec. Litig.,* 375 F. Supp. 2d 983, 1020 (S.D. Cal.

2005), *In re Nuvelo Inc. Sec. Litig.*, 668 F. Supp. 2d 1217, 1222 (N.D. Cal. 2009), and *Warshaw

v. Xoma Comp.*, 74 F.3d 955, 960 (9th Cir. 1996).  That could not be more different from the

situation here, where efficacy is unchallenged.  Instead, Plaintiff's focus is on supposed

nondisclosure of additional (but less severe) adverse events beyond the top-line data VIVUS

released at the start of the class period.  *See Heywood v. Cell Therapeutics, Inc.*, 2006 WL

5701625, at *6 (W.D. Wash. May 4, 2006) (dismissing case and distinguishing *Immune Response*

and *In re Amylin Therapeutics, Inc. Sec. Litig.,* 2003 WL 21500525 (S.D. Cal. May 1, 2003), as

instances where "defendants either grossly misrepresented some specific material fact, or failed to

disclose some concrete indication that they could not expect FDA approval").  Plaintiff does not,

and cannot, point to any similarly negative data withheld from the market.  *In re Merck & Co.,

Inc. Sec., Deriv. & ERISA Litig.*, 2011 WL 3444199 (D.N.J. Aug. 8, 2011), on which Plaintiff

Hogan Lovells US
LLP
Attorneys At Law
Palo Alto

10

REPLY MEM. ISO MOTION TO DISMISS SECOND
AMENDED CLASS ACTION COMPLAINT;
Case No. 4:10-cv-04957-PJH

1   relies, is another case in point.  In sustaining the complaint there, the court identified specific

2   internal e-mails acknowledging the problems defendants publicly claimed did not exist and

3   discussing how to avoid disclosing them, as well as documents showing that defendants

4   disbelieved the hypotheses they proposed publicly.  *Id*. at *11-12, 14.  Here, by contrast, Plaintiff

5   points at most to some additional mild side-effect events, later-voiced Committee member

6   concerns, and vague and undated confidential witness assertions.  The difference is dramatic.

7          As forecast in Defendants' opening papers, Plaintiff relies on *Matrixx Initiatives, Inc. v.*

8   *Siracusano*, 131 S. Ct. 1309 (2011), asserting that some adverse events must be disclosed even if

9   not statistically significant.  *See* Mot. at 17; Opp. at 17.[11]  Plaintiff offered this same overreading

10  of *Matrixx* in opposition to Defendants' prior motion.  Prior Opp. at 8-11.  And as we responded

11  the last time, nothing in *Matrixx* suggests that VIVUS's top-line safety disclosures were

12  inadequate.  Prior Reply at 6-9.  In *Matrixx,* the issuer elected not to disclose reports of adverse

13  side effects of its over-the-counter cold remedy *not* because it believed they were meaningless

14  "but because it understood their likely effect on the market." 131 S. Ct. at 1324–25.  Nothing

15  alleged in the New Complaint suggests that was the case here, and the "effect on the market"

16  when complete data were disclosed confirms it was not.  *Accord Philco Invs. v. Martin*, 2011 WL

17  500694, at * 7-8 (N.D. Cal. Feb. 9, 2011) (release of top-line trial results for Alzheimer's drug not

18  rendered misleading because it did not include all information later released or because plaintiffs

19  disagreed with defendants about data's importance); *see also Philco Invs. v. Martin*, 2011 WL

20  4595247, at *7 n.11 (distinguishing *Matrixx* and dismissing amended complaint with prejudice).

21          The fact is that *Matrixx* reinforces a point that VIVUS has urged and that Plaintiff

22  continues to ignore – *context matters*.  The context that Plaintiff disregards is the extensive, well-

23  documented history of Qnexa's two component drugs, phentermine and topiramate – drugs that

24  have been approved for decades and that have been prescribed to literally millions of patients at

---

[11] Plaintiff makes the bizarre argument that Defendants somehow equate the "avalanche of information" *Matrixx* says need *not* be disclosed with the *length* of Plaintiff's New Complaint. Opp. at 9 n.9.  That nonsensical contention aside, *Matrixx* does undercut Plaintiff's claim that Defendants misled the market by disclosing serious and moderate adverse events regarding, for example, psychological and cognitive data without simultaneously presenting *all* of the safety data, including the large number of mild adverse events observed.  *See* 131 S.Ct. at 1318.

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
PALO ALTO

11

REPLY MEM. ISO MOTION TO DISMISS SECOND
AMENDED CLASS ACTION COMPLAINT;
Case No. 4:10-cv-04957-PJH

1  much higher doses than in Qnexa.  Mot. at 14-15.  That context was known and understood by the

2  FDA, by the Advisory Committee *and by the markets*.  *Id.*  And VIVUS *specifically disclosed*

3  risks relating to the known side effects of these components, *e.g.,* Ex. P at 36-39, including many

4  of the very risks that Plaintiff says VIVUS hid, *cf.* ¶ 57(a)(i) (potential for cognitive and

5  psychological side effects); 57(b)(i) (longer-term studies potentially required).

6        When VIVUS disclosed that the Qnexa trials showed "nothing unexpected," it was

7  understood that the baseline expectations were established by the component drugs – a point

8  repeatedly emphasized in the statements Plaintiff challenges.  *See, e.g.*, ¶¶ 70, 150.  In his

9  Opposition, Plaintiff adheres to his unsupported assertions that the combination of the drugs

10  "increased the known risks and magnitude of the side effects beyond those associated with each

11  component individually and/or was creating new, potentially serious side effects."  Opp. at 15-16,

12  10 n.10.  But as noted in our opening papers, this assertion is made without reference to any data,

13  Committee member comment, media analysis or other factual underpinning.  Mot. at 15.  Plaintiff

14  has just invented these assertions for his New Complaint; he offers no facts to support his

15  insinuation that Defendants' statements about the consistency of the Qnexa safety profile with

16  that of its components was in any sense false or misleading.  His only response now is that he is

17  "not required to plead evidence."  Opp. at 16 n.14.  Once again, Plaintiff ignores his substantial

18  pleading burden, and he confuses evidence with the specific fact-based allegations that absolutely

19  *are* required under applicable pleading rules.

20             4.    Defendants' statements about trial results related to specific potential side
effects were truthful.

21        Defendants will not repeat the detailed arguments regarding Plaintiff's various safety-

22  related assertions from their opening brief and prior briefing as Plaintiff's basic assertions about

23  these matters are unchanged.  Mot. at 14-21.  *See also* Prior Mot. at 14-21; Prior Reply at 9-14.

24  However, a few comments in response to the Opposition are in order to demonstrate the lengths

25  to which Plaintiff goes to concoct a fraud.

26        **Psychiatric Results.**  Plaintiff says Defendants' statements about psychiatric events in the

27  Phase 3 trials were misleading because they "repeatedly affirmatively reiterate[ed] the absence of

28

Hogan Lovells US
LLP
Attorneys At Law
Palo Alto

12

REPLY MEM. ISO MOTION TO DISMISS SECOND
AMENDED CLASS ACTION COMPLAINT;
Case No. 4:10-cv-04957-PJH

1    any data signaling a suicide risk," and "omitt[ed] any mention of data in their possession showing

2    depression among patients."  Opp. at 6; *see also id.* at 1.  But even Plaintiff recognizes that the

3    FDA Committee members noted "the absence of a clear signal for suicide risk."  Opp. at 7

4    (quoting Dr. Rogawski – who voted for approval – that "we didn't pick up an increase in

5    suicidality risk").  Given the data, which Plaintiff does not challenge, it was entirely accurate for

6    Defendants to note the absence of a signal for suicide.  *Accord* Reply Ex. 1 at 3 ("no reported

7    adverse events regarding suicidality in the 2-year safety cohort").  While he repeats the word

8    "suicide" over and over in both his New Complaint and Opposition, Plaintiff pleads no facts to

9    contradict the no-signal conclusion.

10        His assertion that Defendants omitted "any mention" of depression data is flatly untrue.

11   VIVUS disclosed data for moderate and severe depression-related adverse events, as well as for

12   depression-related study discontinuations, on Day 1 of the class period.  Ex. L at slides 29-30.

13   Plaintiff does not suggest the reports were inaccurate; but he says that VIVUS should also have

14   disclosed data about *mild* depression events because the differential incidence of events between

15   top-dose and placebo patients was wider with mild events (the majority of events) included.[12]

16        Plaintiff does not plead facts suggesting that disclosure of mild events mattered.  He

17   asserts, however, that it is "undeniable" that "had investors been aware of the true extent of the

18   adverse indications," they would have paid less for VIVUS shares, citing cases saying that

19   securities are accurately valued where negative study results are available to the market.  *See* Opp.

20   at 8.  But the judicially noticeable facts show precisely the opposite.  In reality, when the so-

21   called "true extent" of the psychiatric adverse events was made public in the briefing documents

22   released before the Advisory Committee meeting, VIVUS's stock price *rose*, and analysts noted

23   the "low" level of psychiatric side effects  (Ex. F at ¶ 3).  *See supra* Part III.C.1.  Moreover,

24   contrary to Plaintiff's claim that Defendants falsely implied depression concerns "presented no

25   risk to FDA approval," (Opp. at 8), VIVUS in fact made specific risk disclosures that the

26   psychiatric side effects observed in Qnexa's components, as well as the shadow cast by adverse

27

28

---

[12]  The FDA's briefing document defines a mild event as one which "[d]oes not interfere with the
subject's usual function."  Ex. J at 80.

Hogan Lovells US
LLP
Attorneys At Law
Palo Alto

13

REPLY MEM. ISO MOTION TO DISMISS SECOND
AMENDED CLASS ACTION COMPLAINT;
Case No. 4:10-cv-04957-PJH

effects of other weight-loss drugs, could negatively affect Qnexa's approval chances.  *E.g.*, Ex. P at 36-39.  Finally, despite Plaintiff's table-banging about the purportedly pervasive incidence of adverse psychiatric side effects, it is notable that Plaintiff does not allege psychiatric issues as a reason listed by FDA for disapproval in its October 2010 CRL (and they were not).  ¶ 239.

**Cognitive Results.**  Plaintiff also does not and cannot allege that cognitive issues were cited in the CRL as a reason for initial disapproval of Qnexa (again, they were not).  ¶ 239.  Even the analyst quoted in the New Complaint stated that most of the Committee was unconcerned with cognitive issues.  Mot. at 19; ¶ 235.  Yet because the 2010 vote was ultimately negative, Plaintiff cries fraud here as well.  The claim is that Defendants said early in the class period, based on expert analysis, that there was "no clinically significant change in overall cognitive function."  Opp. at 9.  They said it again in their detailed briefing to the FDA.  Ex. D at 121.  But the FDA Memo reflects no disagreement.  Ex. J at 5.  Market analysts, the FDA reviewer, and Committee members all noted that the observed cognitive effects were known side effects of topiramate.  *E.g.*, ¶ 235, Ex. G at 138, 299.  Those effects were covered in VIVUS's risk disclosures.  *E.g.*, Exs. O at 62, P at 37.  Yet Plaintiff says the public was tricked.

Once more, Plaintiff fails to identify anything in the trial data that contradicted public statements, but only points to additional, mild adverse events (that did not change VIVUS's conclusions when presenting the data to the FDA) and calls on *Matrixx* for salvation.  But again, nothing in *Matrixx* implies that *every* adverse effect must be disclosed; indeed, it holds the opposite.  131 S. Ct. at 1321; *see also* Mot. at 17-18.

**Cardiovascular Results.**  Plaintiff's claims about cardiovascular safety results turn on two issues that received almost no mention in the Committee's discussion: the withdrawal of the drug combination fen-phen from the market, and potassium.  Opp. at 10-11.  The FDA Memo disposed of the fen-phen issue by simply repeating its conclusion, reached after research following the fen-phen situation of 12 years before, that the phentermine component of that product was *not* the cause of fen-phen's cardiovascular side-effects.  Ex. J at 15, 63.  Nothing in the Advisory Committee record suggests that fen-phen was the reason for the negative vote in July 2010; but even if it were, VIVUS's risk disclosures throughout the class period disclosed the

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
PALO ALTO

14

REPLY MEM. ISO MOTION TO DISMISS SECOND
AMENDED CLASS ACTION COMPLAINT;
Case No. 4:10-cv-04957-PJH

1   threat that fen-phen posed to possible approval of Qnexa.[13]  Investors were not misled.

2        Nor were the Qnexa trial data showing a slight increase in heart rate among trial subjects a

3   surprise, as Plaintiff asserts.  Opp. at 11.  In fact, the one beat-per-minute average increase in

4   heart rate was disclosed in briefings the third day of the class period.  ¶ 75.  (Although he quotes

5   Dr. Day's September 11, 2009 statement, Plaintiff appears to be talking about precisely this

6   increase where he refers to "the undisclosed increased heart-rate signal." *Id.* at 10.)  To contradict

7   Dr. Day's conclusion that the increase was not of clinical concern, Plaintiff makes assertions

8   about potassium that are neither supported nor linked to the Phase 3 trial data.  Yes, the

9   Committee briefing documents included data on decreased potassium levels (a known side effect

10  of topiramate (¶ 262)); but the Committee never so much as mentioned potassium.  Mot. at 21.[14]

11       Plaintiff also says that certain Committee members' concerns about cardiovascular safety

12  did more than "evidenc[e] simply the desire for more research."  Opp. at 10.  Yet after another

13  year of data that, according to the FDA, showed the same slight increase in average heart rate, the

14  Committee voted almost unanimously to recommend approval.  Reply Ex. 1 at 3.  *Cf.*

15  *Construction Laborers Pension Trust of Greater St. Louis v. Neurocrine Biosciences, Inc.*, 2008

16  WL 2053733 at *7 (S.D. Cal. May 13, 2008) (though FDA requested further data analysis, the

17  data provided met FDA approval guidelines, which "tends to negate the inference defendants

18  ────────────────────────────

19  [13]  *See, e.g.*, Ex. P at 36, from risk subsection *headlined* "Association with fen-phen could lead to
    increased scrutiny of our investigational product candidate, Qnexa": "Moreover, the adverse

20  clinical history of fen-phen and dexfen-phen combinations for obesity may result in increased
    FDA regulatory scrutiny of the safety or the risk/benefit profile of Qnexa and may raise potential

21  adverse publicity in the marketplace, which could affect clinical enrollment or ultimately market
    acceptance if Qnexa is approved for commercial sale."  *See also* Ex. O at 61; Ex. Q at 63-64.

22  Plaintiff ignores these disclosures when he asserts, without factual support, that "Defendants …
    either knew, or recklessly ignored" this potential scrutiny.  Opp. at 10.

23  [14]  In our opening brief, we pointed to numerous inconsistencies in Plaintiff's story of supposedly

24  illicit potassium supplementation in a Phase 1 trial (but not in the Phase 3 trials).  Mot. at 21, 28.
    Plaintiff's Opposition makes no attempt to respond to or clarify the issue, simply repeating the

25  New Complaint's allegations.  Opp. at 11.  Even accepting Plaintiff's uncorroborated CW
    allegations as to the Phase 1 trial as true (they are not), Plaintiff offers nothing to connect the

26  allegations to: (1) the Phase 3 results generally; (2) reduction in blood pressure generally (beyond
    noting "*some* evidence, *although not universally accepted*, that potassium supplementation *might*

27  cause a slight drop in blood pressure" (¶ 263) (emphasis added)); (3) reduction in blood pressure
    among Phase 3 trial patients specifically; or (4) any other measured results relevant to

28  cardiovascular data.  Plaintiff fails to explain how this story even makes sense, let alone supports
    his fraud allegations.

Hogan Lovells US
LLP
Attorneys At Law
Palo Alto

15

REPLY MEM. ISO MOTION TO DISMISS SECOND
AMENDED CLASS ACTION COMPLAINT;
Case No. 4:10-cv-04957-PJH

1    knew the FDA would not approve the Application").

2        **Teratogenicity and Metabolic Acidosis Results.**   Nowhere in the New Complaint's

3    exhaustive litany of supposedly false statements does Plaintiff allege any statement about

4    teratogenicity, save Defendants' repeated *risk disclosures* explaining that pregnant women were

5    ineligible for the Phase 3 trials and that Qnexa would have a label "warning against use by

6    women who are or are considering becoming pregnant." ¶ 198; *see also* Exs. O at 62, P at 38, Q

7    at 65, C at 10.  No statements about C labels or X labels are pled, nor are facts alleged to show

8    Defendants said one thing publicly but believed something else about risk of fetal harm.  Indeed,

9    the only Defendant reference to Category C in the record – never mentioned by Plaintiff – is the

10   description of Qnexa's *component* drugs in VIVUS's briefing document, released publicly on

11   July 13, 2010.[15]  Plaintiff simply alleges no false or misleading statement about teratogenicity.[16]

12        5.        Defendants' risk disclosures belie Plaintiff's claims of deception.

13        VIVUS's extensive risk disclosures included detailed cautions that specifically addressed

14   the very issues about which Plaintiff now complains.  Mot. at 23-24.  The complained-of press

15   releases disclosed myriad risks associated with Qnexa's development, approval and marketability,

16   and referred the reader to SEC filings that brim over with risk factors.  *Id*.  VIVUS's statements

17   about the future of Qnexa and of the Company were protected under the safe harbor and bespeaks

18   caution doctrines, Plaintiff's stock objections notwithstanding.  *See In re Bare Escentuals, Inc.*

19   *Sec. Litig.*, 745 F. Supp. 2d 1052, 1080 (N.D. Cal. 2010).  Those statements were identified as

20   forward-looking and were accompanied by meaningful cautionary language; and Plaintiff alleges

21   no facts to support an inference that they were made with actual knowledge of falsity (let alone a

22   strong inference as cogent and compelling as other, non-culpable explanations).  *See* 15 U.S.C. §

23

---

24   [15] Plaintiff notes topiramate was changed to Category D in 2011 and implies VIVUS advocated a
     label for Qnexa less restrictive than that of its components.  Opp. at 12 n.11.  Putting aside
25   Plaintiff's failure to point to *any* VIVUS statement about pregnancy categories or any fact to
     support their suggestion, there can be no doubt that both components were Category C at the time
26   of VIVUS's NDA.  *E.g.,* Ex. D. at 17.

27   [16] After two complaints totaling some 250 pages and two briefs of 60 pages more, Plaintiff has yet
     to reference any Defendant statement on metabolic acidosis or to mention the topic in his briefs in
28   any way (beyond section headings).  Mot. at 21; Prior Reply at 14.  Enough said.

Hogan Lovells US
LLP
Attorneys At Law
Palo Alto

16        REPLY MEM. ISO MOTION TO DISMISS SECOND
          AMENDED CLASS ACTION COMPLAINT;
          Case No. 4:10-cv-04957-PJH

1   78u-5(c).[17]  *See also* Mot. at 25-30; *infra* Part III.D.

2        The pages of risk disclosures included in every one of VIVUS's quarterly filings, *e.g.,* Exs.

3   P at 31-78; Q at 59-97, directly contradict Plaintiff's allegations that material information was

4   withheld from investors.  *See* ¶¶ 184-203.  The risks that resolved negatively on July 15, 2010

5   were disclosed in detail.  *See, e.g.,* Exs. O at 59-63, P at 31-39, 43, Q at 59-66.

6              6.    Statements of general optimism and opinion are not actionable

7        Finally, as with the previous motion to dismiss, Plaintiff makes no effort to distinguish the

8   cases holding that general statements of opinion and optimism do not support a securities fraud

9   claim.  Mot at 22-23 (citing cases).  At most, he makes the general point that optimistic

10  statements may be actionable if defendants fail to disclose material risks that undercut them or

11  that opinions may be actionable if they are knowingly untrue or made without reasonable basis.

12  Opp. at 14 (citing *Virginia Bankshares v. Sandberg*, 501 U.S. 1083 1093-94 (1991); *Amylin*, 2003

13  WL 21500525, at *5).  As we have explained, Plaintiff does not allege specific facts to support

14  either situation.  *See, e.g.*, *Yourish v. California Amplifier,* 191 F.3d 983, 997 (9th Cir. 1999)

15  ("clearly insufficient" for plaintiffs to say that a "later, sobering revelation" makes "an earlier,

16  cheerier statement a falsehood.");  Mot. at 23.  Neither Plaintiff's cases nor any fact alleged in the

17  New Complaint explain how statements that, for example, Qnexa has an "excellent" or

18  "compelling" risk/benefit profile (*e.g.*, ¶¶ 55(a), 69(b)), or that trials have shown "remarkable"

19  safety and efficacy (*e.g.*, ¶ 57(d)) could be actionable.  *Glen Holly Entm't Inc. v. Tektronix, Inc.*,

20  352 F.3d 367, 379 (9th Cir. 2003); *Philco*, 2011 WL 500694, at *6.

21       **D.    Plaintiff Fails to Allege A Strong Inference of Scienter**

22        Plaintiff says a conclusion that VIVUS's statements about Qnexa were accurate and

23  reasonable is possible only by ignoring the collective approach to scienter required by *Matrixx*

24  _____

25  [17] Plaintiff says that some statements involved present facts.  Opp. at 29.  But "even a statement
    of present fact may become a forward-looking statement if a plaintiff's sole allegation of falsity is
    based on the existence of some future risk of failure."  *In re Discovery Labs. Sec. Litig.*, 2006 WL

26  3227767, at *15 (E.D. Pa. Nov. 1, 2006).  Furthermore, alleged omission of an historical fact does
    not change the analysis because "when the factors underlying a projection … include both

27  assumptions and statements of known fact, and a plaintiff alleges a material fact is missing, the
    entire list of factors is treated as a forward-looking statement."  *In re Avon Prods., Inc. Sec. Litig.*,

28  2009 WL 848017, at *17 (S.D.N.Y. Feb. 23, 2009).

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
PALO ALTO

17       REPLY MEM. ISO MOTION TO DISMISS SECOND
         AMENDED CLASS ACTION COMPLAINT;
         Case No. 4:10-cv-04957-PJH

1   and *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).  Opp. at 20.  He says that

2   "Defendants cannot demonstrate … that an inference of non-fraudulent intent is more plausible

3   than the competing inference of fraud."  *Id*. at 19-20.  But it is *Plaintiff* who has the burden to

4   plead scienter sufficiently and that an inference of fraud is the more plausible one to draw from

5   the facts alleged.  It is he who has failed to carry that burden.  Notwithstanding, Defendants *have*

6   in fact shown non-fraudulent intent to be far more plausible.  *Tellabs*, 551 U.S. at 323.  By any

7   fair reading of the record, the alleged misstatements, viewed in light of *all* facts alleged and in the

8   public domain, tell a story of honest optimism, not of deceit.

9           Among those facts that make Defendants' the more compelling interpretation are that:

10  •   Based on the data obtained in earlier-phase trials of Qnexa, VIVUS spent tens of
        millions of dollars on pivotal Phase 3 clinical trials, involving thousands of patients as
11      part of an effort to demonstrate the safety and efficacy of Qnexa;

12  •   Qnexa's year-long Phase 3 clinical trial results showed dramatic weight loss and
        improvements in weight-related co-morbidities to a degree far beyond the thresholds
13      established to show the drug's efficacy;

14  •   Qnexa is composed of two drugs that have long been approved by the FDA and have
        been used, at much higher dosing levels, for decades by millions of patients;

15  •   while dose-related side effects were observed in the Phase 3 trials, no issues were
        observed that were (a) outside the labels for Qnexa's component drugs; or (b) more
16      severe than expected from the components;

17  •   while phentermine had been associated with the problematic "phen-fen" combination,
        evidence had shown the issues to be with the "fen" side of that combination; and
18

19  •   there exists a strong market demand for a safe, efficacious drug to treat obesity.

20  Against this backdrop, a "collective" view of Plaintiff's vague allegations does not approach a

21  cogent and compelling inference of scienter, and certainly not one that is more plausible than that

22  Defendants genuinely believed in the promise of this drug.  The "omissions" Plaintiff has alleged

23  – additional data on mild depression or cognitive effects; additional, consistent analysis of the

24  disclosed slight increase in heart rate; potential longer-term side effects related to Qnexa's

25  component drugs – do nothing to change the big picture, to undercut Defendants' justifiable

26  optimism, or to explain why Defendants would have engaged in the reprehensible conduct

27  Plaintiffs posit.  *See* Mot. at 26; *AstraZeneca*, 559 F. Supp. 2d at 470 (presence of side effects that

28  may affect a drug candidate's risk-benefit analysis does *not* show fraud where management

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
PALO ALTO

18

REPLY MEM. ISO MOTION TO DISMISS SECOND
AMENDED CLASS ACTION COMPLAINT;
Case No. 4:10-cv-04957-PJH

1    released positive reports that were believed true or showed no reckless disregard for the truth).

2           Plaintiff's scienter allegations are based on (a) unsubstantiated assertions attributed to

3    unidentified Confidential Witnesses ("CWs"), and (b) conclusory allegations about Defendants'

4    motives extrapolated from routine corporate objectives and non-discretionary stock trades.  The

5    allegations are unchanged from Plaintiff's prior pleading, (*compare* ¶¶ 242-96 *with* AC ¶¶ 148 -

6    89); and his arguments in opposition to our motion are substantively identical to the prior round

7    of briefing as well.  *Compare* Opp. at 19-29 *with* Prior Opp. at 19-28.  So are our responses.  His

8    CW's were in no position to know anything meaningful, and nothing of any moment is attributed

9    to them anyway.  Prior Reply at 17-19; *see also Applestein v. Medivation, Inc.*, 2012 WL 986276

10   (N.D. Cal. Mar. 22, 2012) (dismissing with prejudice claims based on unreliable and

11   uncorroborated CW statements).  The only potentially relevant stock sales he alleges were Mr.

12   Wilson's, all of which were non-discretionary and executed under a Rule 10b-5-1 plan that was in

13   place six months before the class period began.  Prior Reply at 19-20.  As we have detailed now

14   multiple times, none of Plaintiff's scienter points – separately or collectively – supports any

15   inference of scienter.  Mot. at 25-30; Prior Mot. at 25-30; Prior Reply at 16-20.

16          Even if Plaintiff's wafer-thin CW and motive allegations could somehow be seen to

17   support a scienter inference, it remains Plaintiff's burden to show that the inference is both cogent

18   and compelling, and as plausible as the non-culpable inference that Defendants' optimism was

19   honest.  On the record as it stood *before* February 22, 2012, it was certainly plausible that

20   Defendants genuinely believed that Qnexa's safety profile supported FDA approval, particularly

21   when combined with the drug's undisputed efficacy in combatting one of America's most serious

22   public health problems.  Indeed, with a split Advisory Committee vote that included a substantial

23   minority of recognized, independent experts supporting approval, it is difficult to characterize

24   Defendants' belief in Qnexa's prospects as *im*plausible.  Certainly nothing Plaintiff has alleged

25   undermines that notion, especially to the point that their assertion of fraud is more compelling.

26          Were there any doubt as to this outcome, the doubt cannot survive the February 2012

27   Committee meeting, where a near-unanimous panel voted to recommend approval of Qnexa.  The

28   vote came after the FDA independently determined that data from a year-long extension of the

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
PALO ALTO

19

REPLY MEM. ISO MOTION TO DISMISS SECOND
AMENDED CLASS ACTION COMPLAINT;
Case No. 4:10-cv-04957-PJH

1   pivotal Phase 3 trials confirmed the safety profile for Qnexa that VIVUS had put forward a year

2   earlier.  (It also reconfirmed the drug's efficacy over the longer-term.)  It took some additional

3   time, but the news from the second year of trial data was that there was no news.  The safety data

4   was remarkable in its consistency and its confirmation of the data that had led Defendants to

5   express their optimism in the first place.  This time around, with confirmatory data to allay

6   hypothetical concerns expressed by some in July 2010, the vote followed, with many of the same

7   experts who had previously opted for caution and more data voting now to recommend approval.

8   *See supra* Part II.  Given the safety data that supported the new NDA and Committee vote and its

9   consistency with the original data, the more plausible explanation of events is the non-culpable

10  inference of Defendants' genuine belief in Qnexa's prospects.  Plaintiff has offered nothing that

11  comes close to a more cogent and compelling explanation, and this shortcoming also mandates

12  dismissal of the New Complaint.

13  **IV.     CONCLUSION**

14          For the foregoing reasons and those discussed in Defendants' opening papers, the New

15  Complaint should be dismissed.  Because Plaintiff has already been afforded the opportunity to

16  cure his deficient pleading and has failed to do, the dismissal should be with prejudice.

17

18
    Dated: March 30, 2012                         HOGAN LOVELLS US LLP
19

20

21                                                By:   */s/ Michael L. Charlson*
                                                      Michael L. Charlson
22
                                                  Attorneys for Defendants
23                                                VIVUS, INC., LELAND F. WILSON, and
                                                  WESLEY W. DAY, Ph.D.
24

25

26

27

28

Hogan Lovells US
LLP
Attorneys At Law
Palo Alto

20          REPLY MEM. ISO MOTION TO DISMISS SECOND
            AMENDED CLASS ACTION COMPLAINT;
            Case No. 4:10-cv-04957-PJH